UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| KIRK MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:08-CV-100 PS |
| | ) | |
| KENNETH FRIES, CHARLES HART, | ) | |
| NURSE PAM, and MERISSA RUNYON, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Kirk Martin, a *pro se* plaintiff, arrived at the Allen County Jail in December 2007 in a wheelchair due to preexisting injury to his right ankle. He brought this action in April 2008 against Sheriff Kenneth Fries, Commander Charles G. Hart, Pam Thorton (who was sued under the name "Nurse Pam") and Merissa Runyon, alleging that they were deliberately indifferent in treating his ankle problem and his other pre-existing health conditions in violation of the Eighth Amendment. (DE 1, Compl.) The record establishes that Martin received more than adequate care while incarcerated and the times when he didn't get care it was because he obstinately refused it. The Defendants move for summary judgment, which for the reasons stated below, is now granted. (DE 76, Defs.' Mot.)

## RELEVANT FACTS

The facts are basically undisputed unless otherwise noted. Martin was arrested for felony drunk driving on July 23, 2007, but was released on his own recognizance under the Alcohol Abuse Deterrent Program. On December 27, 2007, Martin tested positive for alcohol so the court revoked his conditional release and remanded him to the Allen County Jail. (DE 83-2, Martin Aff. ¶¶ 1-5.) Upon his entry at the jail, a health appraisal was conducted as part of the intake

process. During the health appraisal, Martin disclosed that he regularly used alcohol once or twice a day, and had drank a quart of vodka the day before his arrest. It was noted that Martin had an inhaler with him for unspecified respiratory problems, and he was allowed to keep it. Under the category of "Cardiovascular Issues" it was noted that Martin had high blood pressure. And under the section labeled "Gastrointestinal," it was noted that Martin suffered from constipation, but no other problems were identified. (DE 78-15, Medical Records, at 259; DE 78-16, Medical Records, at 260-63; DE 78-2, Martin Dep. Tr. at 82-84.)

The appraisal form noted that Martin was in a wheelchair and wore a supportive leg brace ("cam boot") on his right foot, due to a preexisting injury to his right ankle, for which he had received treatment at the Veterans Administration Medical Center ("VA") in Indianapolis.[1] The jail medical staff determined that regular circulation checks should be done of Martin's ankle. The health appraisal form also listed Martin's medications, the acid reducer Omeprazole, Hydroclorothiazide, a diuretic used to treat high blood pressure, and two different vitamins, thiamine and folate. There was also the notation "gallbladder surgery." Martin signed a request for authorization to release medical records so that Allen County Jail nursing personnel could obtain his medical records from the VA. (DE 78-15, Medical Records at 248; DE 78-16, Medical Records at 260-63; DE 78-2, Martin Dep. Tr. at 90-91; DE 78-3, House Dept. Tr. at 24.)

On December 28, 2007, and December 30, 2007, Martin requested a 24-hour pass or transportation to attend an appointment he had scheduled at the VA orthopaedic clinic in

---

[1] Martin fell in his home in August 2007 and fractured his right ankle, and underwent surgery to have pins and screws placed in his ankle at the VA. He was involved in a car accident in October 2007, at which time his ankle injury was exacerbated. He underwent a second surgery on December 17, 2007, to have the pins and screws removed. (DE 83-2 at 1.)

2

Indianapolis. On December 31, 2007, nursing personnel at the jail advised Martin that he must be seen at sick call by the jail doctor first. Martin refused to allow the nurses to conduct a circulation check of his ankle on December 29, 2007 and December 31, 2007, and also refused sick call on December 31, 2007 and January 2, 2008. (DE 78-15, Medical Records at 246-56; DE 78-2, Martin Dep. Tr. at 89-91.)

Martin did an about face on January 4, 2008. He requested to be seen at sick call so that stitches could be removed from his right ankle. Martin also tendered a laundry list of medical procedures that he wanted done: (1) an appointment be made with an orthopaedic specialist; (2) surgery be arranged to remove his gallbladder; (3) surgery be arranged to repair a hernia; and (4) an appointment be made with an oncologist "due to Cat-scan showed possible cancerous nodes in my lungs." According to Martin, he requested sick call that day because he "realized [he] was not getting out of jail anytime soon." (DE 78-2, Martin Dep. Tr. at 96; DE 78-14, Medical Records at 230.)

Dr. B.P. House, a physician who is board certified in emergency medicine, was the medical director at the Allen County Jail during this period. He examined Martin on January 7, 2008. As a result of his examination, Dr. House noted the following: "one stitch in right ankle, wound well healed. Treatment, remove suture." Dr. House instructed that a follow-up appointment should be arranged with orthopaedics for Martin's right ankle. He also instructed that the CT reports of Martin's abdomen and chest should be obtained from the VA and an appointment arranged with oncology "if he has enlarged lymph nodes." (DE 78-14, Medical Records at 227; DE 78-3, House Dep. Tr. at 14-16.)

As a result of Dr. House's orders, the VA was contacted by the jail's nursing staff, and

thereafter Dr. Webster, an orthopaedic physician at the VA, submitted an order to the jail providing that Martin should discontinue use of the wheelchair use, that his sutures should be removed if they hadn't already, and that Martin should follow up with the VA upon his release from jail. Nursing personnel at the jail confirmed this order with Mike Williams, a physician assistant at the VA orthopaedic clinic. (DE 78-3, House Dept. Tr. at 15-18; DE 78-11, Medical Records at 187; DE 78-14, Medical Records at 217-18, 227.)

The VA medical records were thereafter obtained by jail nursing personnel. The records showed that a CT scan of Martin's thorax had been performed on December 6, 2007, and the report suggested a follow up study in three months. The VA medical records also included a CT scan of Martin's abdomen taken on October 31, 2007. The report concluded that Martin had gallstones, and the CT scan revealed a small umbilical hernia. Dr. House reviewed the CT scans but concluded that based on his medical judgment they did not show an acute or urgent condition necessitating surgery or other medical care other than what the jail was already providing.[2] (DE 78-3, House Dep. Tr. at 18-21; DE 78-12, Medical Records at 192-93.) Accordingly, the nursing personnel at the jail notified Martin as follows on January 11, 2008:

> (1) You are to follow-up with the VA Orthopaedic Clinic if you experience any problems with your ankle. (2) You are due for a follow-up CT scan of your thorax in March 2008. (3) You were a no-show for a GI consult appointment regarding your gallbladder in 9/07. You will need to notify staff if you experience any problems.

---

[2] Dr. House testified that gallstones "can be present for years and not cause any problems or symptoms," and that a small umbilical hernia does not require immediate surgery. He further testified that the CT report of Martin's lungs did not recommend any type of surgical intervention but merely recommended follow-up with another CT scan in three months. He testified that three months was a "guideline" and "not absolute," and that follow-up should simply be done "within a reasonable time period." (DE 78-3 at 19-21, 31.)

(DE 78-11, Medical Records at 191.)

On January 17, 2008, Martin refused sick call. A member of the nursing personnel went to Martin's cell and talked to him about the need for the circulation checks of his ankle. Martin responded that he would only go to sick call if his wheelchair was returned to him. The nurse attempted to explain the VA's order to discontinue use of the wheelchair, but Martin got "irritable" with her. (DE 78-11, Medical Records at 188.)

On February 1, 2008, Martin was released from jail on home detention with electronic monitoring, with the understanding that he would enter a guilty plea the following week pursuant to a plea agreement. At this time, Martin also had a civil lawsuit pending against a company called Citi-Link concerning a personal injury he allegedly suffered in October 2007. On the date of his release, Martin contacted Citi-Link and settled his civil case for $1,200. Evidently, Martin liked to drink more than he disliked jail because, in his words, "The party was on. I had a bottle of vodka there, because there was no way I was going to plead guilty the next week." Later that evening, police personnel went to Martin's home and asked him whether he had been drinking. Martin responded, "Hell, yes!" Martin was taken into custody and returned to jail that night for violation of the home detention rules. (DE 78-11, Medical Records at 188; DE 78-2, Martin Dep. Tr. at 136-38.)

Upon Martin's return to the jail, nursing personnel provided that all prior orders and medications would be resumed. Merissa Runyon ("Nurse Runyon") made a phone call to the VA to reinstate all of Martin's medications. On February 8, 2008, Dr. Weir from the VA sent an order to the nursing personnel at the jail providing that Martin "may discontinue use of cam boot and weight bear as tolerated on right ankle." A copy of this order was provided to Martin on this

5

same date. On February 27, 2008, a patient advocate at the VA faxed Nurse Runyon a letter advising that the VA would not provide medical care to Martin while he was incarcerated.[3] Martin was given a copy of this letter and advised that if he had any problems with his ankle or other health problems, he could be seen at sick call. (DE 78-11, Medical Records at 151-53, 162, 163, 171, 188.)

On March 6, 2008, Martin submitted a medical request form claiming that his right ankle had been "reinjured . . . when a Lieutenant and a Corporal handcuffed me and dragged me from a downstairs holding cell up to a locked down cell." He was seen by medical staff the following day during sick call and complained of continuing pain in his ankle. The examination of Martin's ankle was normal but some generalized swelling and tenderness was noted. The treatment plan was to have Martin undergo an orthopaedic consult and be given ibuprofen for pain and swelling. (DE 78-11, Medical Records at 143; DE 78-10, Medical Records at 140.)

On March 12, 2008, Martin was transported to St. Joseph Hospital's orthopaedic clinic, but they would not see him because in their view it was not an emergency, and Martin had an outstanding pre-incarceration bill that he had refused to pay. On March 27, 2008, Pam Thornton ("Nurse Thornton") obtained the cost of a consult visit at Orthopaedics Northeast ("ONE") per Martin's request, in which he stated, "Please provide me with the cost and approximately how

---

[3] Martin vigorously asserts that this was not when the nursing staff first learned that the VA would not provide medical care to an incarcerated veteran; he attests that Nurse Runyon suggested as much to him in a conversation they had in January 2008. (DE 83, Pl.'s Mem. at 1; DE 83-2, Martin Aff. ¶ 7.) There is not necessarily a conflict in the evidence, however, since Nurse Runyon could have made that comment in January 2008 based on her prior experience even though the jail did not receive formal notification from the VA about Martin's treatment until February 2008. Assuming there is a factual dispute on this issue, it would not be material to the resolution of Martin's claim that the jail denied him proper medical care under the Eighth Amendment.

long the wait and I'll get you the money." Nurse Thornton advised him the following day that the surgical consult appointment was between $150 and $250. (DE 78-10, Medical Records, at 120, 131.) Dr. House's view at this time was that none of Martin's health problems required any urgent or immediate care beyond what the jail was providing. (DE 78-3, House Dep. Tr., at 28-29.)

On May 6, 2008, Martin was treated at sick call due to complaints of night sweats, "gallbladder pain," ankle pain, and stomach irritation due to the ibuprofen. Nursing personnel conducted an examination and found proper lung function, normal blood pressure, and heart rate at the high normal range. His breath sounds were clear and his abdomen was found to be soft, round, and non-tender on palpation, which is inconsistent with someone experiencing severe gallbladder pain. An inhaler was prescribed and it was ordered that Tylenol be substituted for ibuprofen. (DE 78-10 at 93; 78-3 at 32-35.)

The following day, Dr. House completed a medical transport request form for Martin to be evaluated at ONE due to "ongoing claims of pain/inability to walk," and to evaluate his need for a wheelchair. Martin was evaluated at ONE on May 13, 2008, by Dr. McManus. X-rays were taken of his ankle, which were normal except for a small oscal, or bone, on the inside of the ankle, which may have been a complication of the fracture. According to Dr. House, this was unremarkable; many people have an oscal "as a normal condition." (DE 78-3, House Dep. Tr. at 38.) Dr. McManus recommended physical therapy for two to three weeks and a fixed-ankle walker for walking and standing activities "so that he could ambulate without the use of a wheelchair," and directed a follow-up visit in three to four weeks. Martin thereafter received physical therapy treatment and his cam boot was returned to him. (DE 78-9, Medical Records at

7

69; DE 78-10, Medical Records at 70-74; DE 78-2, Martin Dep. Tr. at 162-63.)

On May 14, 2008, Martin requested sick call for stronger pain medication; he was seen that same day and a different pain medication was prescribed. On May 23, 2008, Martin was seen at sick call due to complaints of chest pains. After a history and evaluation was completed, Martin was prescribed Darvocet for pain and told to be rechecked the following week at sick call. On May 27, 2008, Martin was seen at sick call after he complained of "right chest pain and nausea, known gallbladder problems at VA Hospital, scheduled for gallbladder surgery." After an evaluation and normal findings, the medical staff recommended a low fat diet, Pepcid, and directed him to see the VA regarding his gallbladder after his release. (DE 78-3, House Dep. Tr. at 40-42; DE 78-9, Medical Records at 54.)

On June 5, 2008, Martin completed a medical request form alleging that he had been assaulted by a correctional officer and that his right ankle had been re-injured. Martin was seen at sick call the following day. A request was completed that same day for Martin to be transported to a medical facility to obtain an x-ray in order to rule out a fracture to his right ankle. The x-ray was taken and was negative for a fracture. (DE 78-3, House Dep. Tr. at 42-45; DE 78-8, Medical Records at 23; DE 78-9, Medical Records at 28.)

On June 9, 2008, Martin was transported to ONE for his follow-up appointment with Dr. McManus, who recommended that Martin continue to use the cam boot and could use a cane for walking, that he should continue physical therapy for three more weeks, and obtain an MRI if symptoms persisted. (DE 78-3, House Dep. Tr. at 45-46; DE 78-8, Medical Records at 14-15.)

On June 12, 2008, Martin was again seen at sick call, this time complaining that he could not sleep, had anxiety, and wanted a cane. Medical staff recommended a mental health consult

8

for insomnia and gave Martin a cane. Martin returned to sick call the following day complaining of constipation. He was prescribed Dulcolax and told to restart Metamucil. On June 14, 2008, Martin completed a medical request form complaining that his cane did not have a rubber tip on the bottom. He was given a replacement cane and told "[l]et us know if you need anything else." On June 22, 2008, Martin complained of cold symptoms, and he was prescribed Afrin nasal spray and Tylenol. Martin was last seen at sick call on June 23, 2008, where he requested Xanax or Ultram and where he complained of gallbladder problems. He was prescribed Naproxyn and Ultram. (DE 78-3, House Dept. Tr. at 46-49; DE 78-8, Medical Records at 2-10.)

Martin was released from jail on June 23, 2008, and the post incarceration medical care that he received is instructive. He did not continue with physical therapy but continued home exercises for his right ankle. He returned to the VA in Indianapolis for care of his right ankle but physical therapy was not re-ordered, other than the continuation of home exercises. In September 2008, Martin's ankle condition had stabilized and he was released to return to work. Martin has not sought any further medical care for his ankle since September 2008. (DE 78-2, Martin Dep. Tr. at 163-64, 208.)

On August 8, 2008, Martin returned to the VA in Fort Wayne for a CT scan of his thorax. The report of the CT scan revealed that there were no new nodules on Martin's lungs and that the existing nodules "appear[ed] significantly unchanged" with "minimal enlargement" of one node compared to the December 2007 CT scan. The CT scan also found a small hernia and multiple gallstones that were stable, without evidence of inflammation of the gallbladder. On November 28, 2008, a follow-up CT scan was made of Martin's thorax, and no significant changes were noted on any of his health conditions. In January 2009, Martin underwent a test to determine the

9

function of his gallbladder, which revealed normal functioning. None of the physicians treating Martin at the VA following his release recommended surgery. (DE 78-2, Martin Dep. Tr. at 192; DE 78-3, House Dep. Tr. at 52-55; DE 78-4, Medical Records; DE 78-5, Medical Records.)

The policy at the jail regarding the provision of health services is as follows: "Matters of medical, mental health, and dental judgment [are] to be the sole province of the responsible physician, psychiatrist and dentist providing health care services in the Allen County Jail/Lock Up." The policy further provides that the jail will employ or contract with physicians to conduct physical examinations and sick call and will employ nursing personnel to assist with sick call. Nursing personnel are to initiate treatment only upon the written or verbal order of a licensed physician. Emergency Medicine of Indiana ("EMI") was the physician group that contracted to provide medical services to the jail during Martin's incarceration. EMI provided physicians and physician assistants to staff the sick call visits, and was also available for on-call consultations with nursing personnel at the jail. (DE 78-6, Fries Aff. ¶ 4 & Exs.; DE 78-3, House Dept. Tr. at 5-6.)

When a jail physician or physician assistant orders medical treatment, inmates are not required to pay the cost of such treatment, even if it involves treatment at an outside medical facility. However, if a jail physician or physician assistant does not order a particular medical treatment requested by an inmate, the inmate is responsible for payment for ongoing, non-emergency treatment for a pre-existing condition to be rendered by an outside medical facility. (DE 78-7, Fries' Ans. to Interrogs. at 3.)

**LEGAL STANDARDS**

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986.) A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.) "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003).

A party opposing a summary judgment motion "may not rely merely on allegations or denials in its own pleadings" but rather must introduce affidavits or other evidence to "set forth specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "[A] motion for summary judgment requires the responding party to come forward with the evidence that it has—it is 'the put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009).

## ANALYSIS

To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could

result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference is a high standard, and is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks," or a "conscious, culpable refusal" to prevent harm. *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992); *see also*, *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under the circumstances. *Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir.1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an

Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Here, the undisputed facts in the record show that the defendants conducted themselves more than reasonably, and Martin has fallen short – indeed, well short – of proving that they were deliberately indifferent to his medical needs. Medical staff competently evaluated Martin's medical needs when he arrived at the jail, responded promptly to all of Martin's medical requests, seeing him at sick call no less then nine times during his incarceration at the jail, and provided him with his prescribed medications. (*See* DE 78-11, 78-12, 78-13, 78-14, 78-15, 78-16, Medical Records.) There were several instances where Martin did not cooperate in the medical staff's efforts to provide him with medical care, refusing to go to sick call unless a wheelchair was provided to him, which was contrary to the orders of the physician from the VA. (DE 78-15, Medical Records at 246-56; DE 78-2, Martin Dep. Tr. at 89-91; DE 78-11, Medical Records at 188.) On one occasion, when Martin refused to go to sick call, a member of the medical staff personally went to Martin's cell to talk with him about the importance of receiving circulation checks on his ankle. (DE 78-11, Medical Records at 188.)

Medical staff was also proactive in obtaining his medical records from the VA to evaluate his medical needs and made efforts to coordinate his care with the VA doctors who had seen him prior to his incarceration. (DE 78-14, Medical Records at 227; DE 78-11, Medical Records at 151-53, 187, 191; DE 78-12, Medical Records at 192-93.) Martin was taken to outside medical facilities for evaluation, at the jail's expense, and he received physical therapy as ordered by an outside physician. (DE 78-8, 78-9 & 78-10, Medical Records.) The medical staff also complied with the physicians' orders regarding the mobility devices Martin was to be provided. (*See* DE 78-8, 78-11, & 78-14, Medical Records.) Far from being deliberately

indifferent, it seems to me that the jail's medical staff was proactive and careful in its treatment of Martin.

Furthermore, Dr. House offered uncontradicted testimony that none of Martin's health conditions required any type of care other than what the jail provided. (DE 78-3, House Dept. Tr. at 30-34, 56.) Dr. House's opinion is borne out by the fact that following Martin's release from jail, none of his doctors at the VA recommended surgery for any of his health conditions, and he was released from a doctor's care for his ankle problems in September 2008, a few months after he left the jail.[4] (DE 78-2, Martin Dep. Tr. at 163-64, 208; DE 78-3, House Dep. Tr.; DE 78-4 & 78-5, Medical Records.)

Not only has Martin failed to establish deliberate indifference, but he has not shown that he suffered an actual injury as a result of his treatment at the jail, since there is no evidence his pre-existing medical conditions worsened or were exacerbated by the care he received. Martin did not have the right to demand specific care, and at most he has shown a disagreement with jail medical personnel over his treatment, which does not establish an Eighth Amendment violation. *Ciarpaglini*, 352 F.3d at 331. For these reasons, the Defendants are entitled to summary judgment on Martin's Eighth Amendment deliberate indifference claim.

Martin also raises an official capacity claim against the Defendants based on an alleged unlawful policy at the jail regarding the medical treatment provided to inmates. A suit against a

---

[4] At his deposition held in February 2009, Martin testified that his doctors had not recommended surgery. (DE 78-2, Martin Dep. Tr. at 194.) In an affidavit submitted in June 2009 in response to the summary judgment motion, Martin attests, "I am getting scheduled for my hernia surgery soon." (DE 83-2, Martin Aff. ¶ 38.) Accepting as true that Martin may be scheduled for hernia surgery sometime in late 2009, this does not demonstrate that the hernia presented an urgent condition needing immediate surgery or other treatment while Martin was incarcerated at the jail in the spring of 2008.

government officer in his official capacity is treated as a suit against the municipality itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). There is no general *respondeat superior* liability under Section 1983, and instead a municipality will be held liable only if the plaintiff establishes a policy or custom that violates the plaintiff's constitutional rights. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978); *Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009). In order to support such a claim, however, the plaintiff must begin by showing an underlying constitutional violation. *Schor*, 576 F.3d at 779.

Martin claims that the jail has an unconstitutional policy that uninsured inmates were not to receive medical treatment from an outside medical provider unless the treatment is of an emergency nature. As stated above, Martin has failed to prove that his Eighth Amendment rights were violated, and without an underlying constitutional violation his policy claim cannot proceed. But even if Martin could establish an underlying constitutional violation, he has not come forward with any evidence that such a policy exists; instead, the evidence is that treatment will be provided if ordered by a jail physician or physician assistant. (DE 78-7, Fries' Ans. to Interrogs. at 3.) Indeed, Martin's own treatment in this case belies his policy claim, since he did receive medical treatment at an outside facility for a non-emergency condition. (*See* DE 78-8, Medical Records at 14-15; 78-9, Medical Records at 69; DE 78-10, Medical Records at 70-74; DE 78-2, Martin Dep. Tr. at 162-63.) For these reasons, the Defendants are entitled to summary judgment on Martin's policy claim.

## CONCLUSION

For these reasons, the motion for summary judgment (DE 76) is **GRANTED** and final judgment is entered in favor of the Defendants. Martin's motion to set a pretrial conference and

trial date (DE 87) is **DENIED** as moot.

       **SO ORDERED**.

       ENTERED: December 23, 2009

                                             <u>s/ Philip P. Simon</u>
                                           PHILIP P. SIMON, JUDGE
                                           UNITED STATES DISTRICT COURT